(Slip Opinion) OCTOBER TERM, 2005 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## UNITED STATES *v.* GEORGIA ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

No. 04–1203.   Argued November 9, 2005—Decided January 10, 2006*

Goodman, petitioner in No. 04–1236, is a paraplegic who sued respondent state defendants and others, challenging the conditions of his confinement in a Georgia prison under, *inter alia,* 42 U. S. C. §1983 and Title II of the Americans with Disability Act of 1990.  As relevant here, the Federal District Court dismissed the §1983 claims because Goodman's allegations were vague, and granted respondents summary judgment on the Title II money damages claims because they were barred by state sovereign immunity.  The United States, petitioner in No. 04–1203, intervened on appeal.  The Eleventh Circuit affirmed the District Court's judgment as to the Title II claims, but reversed the §1983 ruling, finding that Goodman had alleged facts sufficient to support a limited number of Eighth Amendment claims against state agents and should be permitted to amend his complaint.  This Court granted certiorari to decide the validity of Title II's abrogation of state sovereign immunity.

*Held:* Insofar as Title II creates a private cause of action for damages against States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity. Pp. 5–8.

   (a) Because this Court assumes that the Eleventh Circuit correctly held that Goodman had alleged actual Eighth Amendment violations for purposes of §1983, and because respondents do not dispute Goodman's claim that this same conduct violated Title II, Goodman's Title II money damages claims were evidently based, at least in part, on conduct that independently violated §1 of the Fourteenth Amend-

_____

*Together with No. 04–1236, *Goodman* v. *Georgia et al.,* also on certiorari to the same court.

ment.  No one doubts that §5 grants Congress the power to enforce the Fourteenth Amendment's provisions by creating private remedies against the States for actual violations of those provisions.  This includes the power to abrogate state sovereign immunity by authorizing private suits for damages against the States.  Thus, the Eleventh Circuit erred in dismissing those of Goodman's claims based on conduct that violated the Fourteenth Amendment.  Pp. 5–7.

  (b) Once Goodman's complaint is amended, the lower courts will be best situated to determine in the first instance, on a claim-by-claim basis, (1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such conduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity in such contexts is nevertheless valid.  Pp. 7–8.

120 Fed. Appx. 785, reversed and remanded.

  SCALIA, J., delivered the opinion for a unanimous Court.  STEVENS, J., filed a concurring opinion, in which GINSBURG, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

Nos. 04–1203 and 04–1236

UNITED STATES, PETITIONER
04–1203          *v.*
GEORGIA ET AL.

TONY GOODMAN, PETITIONER
04–1236          *v.*
GEORGIA ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE ELEVENTH CIRCUIT

[January 10, 2006]

JUSTICE SCALIA delivered the opinion of the Court.

We consider whether a disabled inmate in a state prison may sue the State for money damages under Title II of the Americans with Disabilities Act of 1990 (ADA), 104 Stat. 337, as amended, 42 U. S. C. §12131 *et seq.* (2000 ed. and Supp. II).

I
A

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." §12132 (2000 ed.). A "'qualified individual with a disability'" is defined as "an individual with a disability who, with or

without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." §12131(2). The Act defines "'public entity'" to include "any State or local government" and "any department, agency, . . . or other instrumentality of a State," §12131(1). We have previously held that this term includes state prisons. See *Pennsylvania Dept. of Corrections* v. *Yeskey*, 524 U. S. 206, 210 (1998). Title II authorizes suits by private citizens for money damages against public entities that violate §12132. See 42 U. S. C. §12133 (incorporating by reference 29 U. S. C. §794a).

In enacting the ADA, Congress "invoke[d] the sweep of congressional authority, including the power to enforce the fourteenth amendment . . . ." 42 U. S. C. §12101(b)(4). Moreover, the Act provides that "[a] State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in [a] Federal or State court of competent jurisdiction for a violation of this chapter." §12202. We have accepted this latter statement as an unequivocal expression of Congress's intent to abrogate state sovereign immunity. See *Board of Trustees of Univ. of Ala.* v. *Garrett*, 531 U. S. 356, 363–364 (2001).

### B

Petitioner in No. 04–1236, Tony Goodman, is a paraplegic inmate in the Georgia prison system who, at all relevant times, was housed at the Georgia State Prison in Reidsville. After filing numerous administrative grievances in the state prison system, Goodman filed a *pro se* complaint in the United States District Court for the Southern District of Georgia challenging the conditions of his confinement. He named as defendants the State of

Georgia and the Georgia Department of Corrections (state defendants) and several individual prison officials. He brought claims under Rev. Stat. §1979, 42 U. S. C. §1983, Title II of the ADA, and other provisions not relevant here, seeking both injunctive relief and money damages against all defendants.

Goodman's *pro se* complaint and subsequent filings in the District Court included many allegations, both grave and trivial, regarding the conditions of his confinement in the Reidsville prison. Among his more serious allegations, he claimed that he was confined for 23-to-24 hours per day in a 12-by-3-foot cell in which he could not turn his wheelchair around. He alleged that the lack of accessible facilities rendered him unable to use the toilet and shower without assistance, which was often denied. On multiple occasions, he asserted, he had injured himself in attempting to transfer from his wheelchair to the shower or toilet on his own, and, on several other occasions, he had been forced to sit in his own feces and urine while prison officials refused to assist him in cleaning up the waste. He also claimed that he had been denied physical therapy and medical treatment, and denied access to virtually all prison programs and services on account of his disability.

The District Court adopted the Magistrate Judge's recommendation that the allegations in the complaint were vague and constituted insufficient notice pleading as to Goodman's §1983 claims. It therefore dismissed the §1983 claims against all defendants without providing Goodman an opportunity to amend his complaint. The District Court also dismissed his Title II claims against all individual defendants. Later, after our decision in *Garrett*, the District Court granted summary judgment to the state defendants on Goodman's Title II claims for money damages, holding that those claims were barred by state sovereign immunity.

Goodman appealed to the United States Court of Ap-

peals for the Eleventh Circuit. The United States, petitioner in No. 04–1203, intervened to defend the constitutionality of Title II's abrogation of state sovereign immunity. The Eleventh Circuit determined that the District Court had erred in dismissing all of Goodman's §1983 claims, because Goodman's multiple *pro se* filings in the District Court alleged facts sufficient to support "a limited number of Eighth-Amendment claims under §1983" against certain individual defendants. App. to Pet. for Cert. in No. 04–1236, p. 17a, judgt. order reported at 120 Fed. Appx. 785 (2004). The Court of Appeals held that the District Court should have given Goodman leave to amend his complaint to develop three Eighth Amendment claims relating to his conditions of confinement:

> "First, Goodman alleges that he is not able to move his wheelchair in his cell. If Goodman is to be believed, this effectively amounts to some form of total restraint twenty-three to twenty-four hours-a-day without penal justification. Second, Goodman has alleged several instances in which he was forced to sit in his own bodily waste because prison officials refused to provide assistance. Third, Goodman has alleged sufficient conduct to proceed with a §1983 claim based on the prison staff's supposed 'deliberate indifference' to his serious medical condition of being partially paraplegic . . . ." App. to Pet. for Cert. in No. 04–1236, pp. 18a–19a (citation and footnote omitted).

The Court remanded the suit to the District Court to permit Goodman to amend his complaint, while cautioning Goodman not to reassert all the §1983 claims included in his initial complaint, "some of which [we]re obviously frivolous." *Id.*, at 18a.

The Eleventh Circuit did not address the sufficiency of Goodman's allegations under Title II. Instead, relying on its prior decision in *Miller* v. *King*, 384 F. 3d 1248 (2004),

the Court of Appeals affirmed the District Court's holding that Goodman's Title II claims for money damages against the State were barred by sovereign immunity. We granted certiorari to consider whether Title II of the ADA validly abrogates state sovereign immunity with respect to the claims at issue here. 544 U. S. \_\_\_ (2005).

## II

In reversing the dismissal of Goodman's §1983 claims, the Eleventh Circuit held that Goodman had alleged actual violations of the Eighth Amendment by state agents on the grounds set forth above. See App. to Pet. for Cert. in No. 04–1236, pp. 18a–19a. The State does not contest this holding, see Brief for Respondents 41–44, and we did not grant certiorari to consider the merits of Goodman's Eighth Amendment claims; we assume without deciding, therefore, that the Eleventh Circuit's treatment of these claims was correct. Moreover, Goodman urges, and the State does not dispute, that this same conduct that violated the Eighth Amendment also violated Title II of the ADA. See Brief for Petitioner in No. 04–1236, p. 46; Brief for Respondents 41–44. In fact, it is quite plausible that the alleged deliberate refusal of prison officials to accommodate Goodman's disability-related needs in such fundamentals as mobility, hygiene, medical care, and virtually all other prison programs constituted "exclu[sion] from participation in or . . . den[ial of] the benefits of" the prison's "services, programs, or activities." 42 U. S. C. §12132; see also *Yeskey*, 524 U. S., at 210 (noting that the phrase "services, programs, or activities" in §12132 includes recreational, medical, educational, and vocational prison programs). Therefore, Goodman's claims for money damages against the State under Title II were evidently based, at least in large part, on conduct that independently violated the provisions of §1 of the Fourteenth Amendment. See *Louisiana ex rel. Francis* v. *Resweber*,

329 U. S. 459, 463 (1947) (the Due Process Clause of the Fourteenth Amendment incorporates the Eighth Amendment's guarantee against cruel and unusual punishment). In this respect, Goodman differs from the claimants in our other cases addressing Congress's ability to abrogate sovereign immunity pursuant to its §5 powers. See *Tennessee* v. *Lane*, 541 U. S. 509, 543, n. 4 (2004) (Rehnquist, C. J., dissenting) (respondents were not actually denied constitutional rights); *Nevada Dept. of Human Resources* v. *Hibbs*, 538 U. S. 721, 752, 755 (2003) (KENNEDY, J., dissenting) (Nevada provided family leave "on a gender-neutral basis"—"a practice which no one contends suffers from a constitutional infirmity"); *Garrett*, 531 U. S., at 362, 367–368 (failure to make the special accommodations requested by disabled respondents was not unconstitutional); *Kimel* v. *Florida Bd. of Regents*, 528 U. S. 62, 69–70, 83–84 (2000) (most petitioners raised nonconstitutional disparate-impact challenges to the State's age-related policies); *Florida Prepaid Postsecondary Ed. Expense Bd.* v. *College Savings Bank*, 527 U. S. 627, 643–644, and n. 9 (1999) (Florida satisfied due process by providing remedies for patent infringement by state actors); *City of Boerne* v. *Flores*, 521 U. S. 507, 512 (1997) (church building permit denied under neutral law of general applicability).

While the Members of this Court have disagreed regarding the scope of Congress's "prophylactic" enforcement powers under §5 of the Fourteenth Amendment, see, *e.g.*, *Lane*, 541 U. S., at 513 (majority opinion of STEVENS, J.); *id.*, at 538 (Rehnquist, C. J., dissenting); *id.*, at 554 (SCALIA, J., dissenting), no one doubts that §5 grants Congress the power to "enforce . . . the provisions" of the Amendment by creating private remedies against the States for *actual* violations of those provisions. "Section 5 authorizes Congress to create a cause of action through which the citizen may vindicate his Fourteenth Amend-

ment rights."   *Id.*, at 559–560 (SCALIA, J., dissenting) (citing the Ku Klux Klan Act of April 20, 1871, 17 Stat. 13); see also *Fitzpatrick* v. *Bitzer*, 427 U. S. 445, 456 (1976) ("In [§5] Congress is expressly granted authority to enforce . . . the *substantive provisions* of the Fourteenth Amendment" by providing actions for money damages against the States (emphasis added)); *Ex parte Virginia*, 100 U. S. 339, 346 (1880) ("The prohibitions of the Fourteenth Amendment are directed to the States . . . .   It is these which Congress is empowered to enforce . . ."). This enforcement power includes the power to abrogate state sovereign immunity by authorizing private suits for damages against the States.  See *Fitzpatrick*, *supra,* at 456.  Thus, insofar as Title II creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity.  The Eleventh Circuit erred in dismissing those of Goodman's Title II claims that were based on such unconstitutional conduct.

From the many allegations in Goodman's *pro se* complaint and his subsequent filings in the District Court, it is not clear precisely what conduct he intended to allege in support of his Title II claims.  Because the Eleventh Circuit did not address the issue, it is likewise unclear to what extent the conduct underlying Goodman's constitutional claims also violated Title II.  Moreover, the Eleventh Circuit ordered that the suit be remanded to the District Court to permit Goodman to amend his complaint, but instructed him to revise his factual allegations to exclude his "frivolous" claims—some of which are quite far afield from actual constitutional violations (under either the Eighth Amendment or some other constitutional provision), or even from Title II violations.  See, *e.g.*, App. 50 (demanding a "steam table" for Goodman's housing unit). It is therefore unclear whether Goodman's amended complaint will assert Title II claims premised on conduct that

does *not* independently violate the Fourteenth Amendment. Once Goodman's complaint is amended, the lower courts will be best situated to determine in the first instance, on a claim-by-claim basis, (1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid.

\* \* \*

The judgment of the Eleventh Circuit is reversed, and the suit is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

### Nos. 04–1203 and 04–1236

_____

### UNITED STATES, PETITIONER
04–1203        *v.*
### GEORGIA ET AL.


### TONY GOODMAN, PETITIONER
04–1236        *v.*
### GEORGIA ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE ELEVENTH CIRCUIT

[January 10, 2006]

JUSTICE STEVENS, with whom JUSTICE GINSBURG joins, concurring.

The Court holds that Title II of the Americans with Disabilities Act of 1990 validly abrogates state sovereign immunity at least insofar as it creates a private cause of action for damages against States for conduct that violates the Constitution. *Ante*, at 7. And the state defendants have correctly chosen not to challenge the Eleventh Circuit's holding that Title II is constitutional insofar as it authorizes prospective injunctive relief against the State. See Brief for Respondents 6; see also *Miller* v. *King*, 384 F. 3d 1248, 1264 (CA11 2004). Rather than attempting to define the outer limits of Title II's valid abrogation of state sovereign immunity on the basis of the present record, the Court's opinion wisely permits the parties, guided by *Tennessee* v. *Lane*, 541 U. S. 509 (2004), to create a factual record that will inform that decision.* I therefore join the

_____

*Such definition is necessary because Title II prohibits "'a somewhat broader swath of conduct'" than the Constitution itself forbids. *Lane*,

opinion.

It is important to emphasize that although petitioner Goodman's Eighth Amendment claims provide a sufficient basis for reversal, our opinion does not suggest that this is the only constitutional right applicable in the prison context and therefore relevant to the abrogation issue. As we explain, when the District Court and the Court of Appeals revisit that issue, they should analyze Goodman's claims to see whether they state "actual constitutional violations (under either the Eighth Amendment *or some other constitutional provision*)," *ante*, at 7 (emphasis added), and to evaluate whether "Congress's purported abrogation of sovereign immunity in such contexts is nevertheless valid," *ante*, at 8. This approach mirrors that taken in *Lane*, which identified a constellation of "basic constitutional guarantees" that Title II seeks to enforce and ultimately evaluated whether Title II was an appropriate response to the "class of cases" at hand. 541 U. S., at 522–523, 531. The Court's focus on Goodman's Eighth Amendment claims arises simply from the fact that those are the only constitutional violations the Eleventh Circuit found him to have alleged properly. See App. to Pet. for Cert. in No. 04–1236, pp. 18a–19a.

Moreover, our approach today is fully consistent with our recognition that the history of mistreatment leading to Congress' decision to extend Title II's protections to prison inmates was not limited to violations of the Eighth

--------

541 U. S., at 533, n. 24 (quoting *Kimel* v. *Florida Bd. of Regents*, 528 U. S. 62, 81 (2000)). While a factual record may not be absolutely necessary to our resolution of the question, it will surely aid our understanding of issues such as how, in practice, Title II's "reasonableness" requirement applies in the prison context, cf. *Lane*, 541 U. S., at 531–532 (explaining that Title II requires only "'reasonable modifications'"), and therefore whether certain of Goodman's claims are even covered by Title II, cf. App. 83 (complaining of lack of access to, among other things, "television, phone calls, [and] entertainment").

Amendment. See *Lane*, 541 U. S., at 524–525 (describing "backdrop of pervasive unequal treatment" leading to enactment of Title II); see also, *e.g.*, *Board of Trustees of Univ. of Ala.* v. *Garrett,* 531 U. S. 356, 391–424 (2001) (Appendixes to opinion of BREYER, J., dissenting) (listing submissions made to Congress by the Task Force on the Rights and Empowerment of Americans with Disabilities showing, for example, that prisoners with developmental disabilities were subject to longer terms of imprisonment than other prisoners); 2 House Committee on Education and Labor, Legislative History of Public Law 101–336: The Americans with Disabilities Act, 101st Cong., 2d Sess., p. 1331 (Comm. Print 1990) (stating that persons with hearing impairments "have been arrested and held in jail over night without ever knowing their rights nor what they are being held for"); *id.*, at 1005 (stating that police arrested a man with AIDS and "[i]nstead of putting the man in jail, the officers locked him inside his car to spend the night"); California Dept. of Justice, Attorney General's Commission on Disability: Final Report 103 (Dec. 1989) (finding that inmates with disabilities were unnecessarily "confined to medical units where access to work, job training, recreation and rehabilitation programs is limited"). In fact, as the Solicitor General points out in his brief arguing that Title II's damage remedy constitutes appropriate prophylactic legislation in the prison context, the record of mistreatment of prison inmates that Congress reviewed in its deliberations preceding the enactment of Title II was comparable in all relevant respects to the record that we recently held sufficient to uphold the application of that title to the entire class of cases implicating the fundamental right of access to the courts. See *Lane,* 541 U. S., at 533–534. And while it is true that cases involving inadequate medical care and inhumane conditions of confinement have perhaps been most numerous, courts have also reviewed myriad other types of claims by

disabled prisoners, such as allegations of the abridgment
of religious liberties, undue censorship, interference with
access to the judicial process, and procedural due process
violations. See, *e.g., Vitek* v. *Jones*, 445 U. S. 480 (1980)
(procedural due process); *May* v. *Sheahan*, 226 F. 3d 876
(CA7 2000) (access to judicial process, lawyers, legal mate-
rials, and reading materials); *Littlefield* v. *Deland*, 641 F.
2d 729 (CA10 1981) (access to reading and writing materi-
als); *Nolley* v. *County of Erie*, 776 F. Supp. 715 (WDNY
1991) (access to law library and religious services).

Indeed, given the constellation of rights applicable in
the prison context, it is clear that the Eleventh Circuit has
erred in identifying only the Eighth Amendment right to
be free from cruel and unusual punishment in performing
the first step of the "congruence and proportionality"
inquiry set forth in *City of Boerne* v. *Flores*, 521 U. S. 507
(1997). See *Miller*, 384 F. 3d, at 1272, and n. 28 (declining
to entertain United States' argument that *Lane* requires
consideration of constitutional rights beyond those pro-
vided by the Eighth Amendment); App. to Pet. for Cert. in
No. 04–1236, p. 19a (relying on *Miller* to find Goodman's
Title II claims for money damages barred by the Eleventh
Amendment). By reversing the Eleventh Circuit's decision
in this case and remanding for further proceedings, we not
only provide the parties an opportunity to create a more
substantial factual record, but also provide the District
Court and the Court of Appeals the opportunity to apply
the *Boerne* framework properly. Given these benefits, I
agree with the Court's decision to await further proceed-
ings before trying to define the extent to which Title II
validly abrogates state sovereign immunity in the prison
context.